UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROY NAZINITSKY,

                          Plaintiff,

    -against-


FAIRMONT INSURANCE BROKERS, LTD.,

                         Defendant.
-----------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

CV-06-5555 (RRM) (JMA)

A P P E A R A N C E S:

Shaun K. Hogan
Lefkowitz, Louis Sullivan & Hogan LLP
350 Jericho Turnpike, Suite 300
Jericho, NY 11753
      *Attorney for Plaintiff*

Peter T. Shapiro
Lewis Brisbois Bisgaard & Smith LLP
199 Water Street
New York, NY 10038
      *Attorney for Defendant*

**AZRACK**, **United States Magistrate Judge:**

      Plaintiff Roy Nazinitsky brings this action against his employer, Fairmont Insurance

Brokers, Ltd., pursuant to Title VII of the Civil Rights Act of 1964, 41 U.S.C. § 2000e et seq.;

the New York State Executive Law, Human Rights Law § 296; and common law claims for

breach of contract and negligent misrepresentation.  Specifically, as to the federal claims,

plaintiff asserts that defendant discriminated against him because of his lack of religiosity and

subjected him to a hostile work environment.

      By motion dated June 11, 2009, defendant moved for summary judgment pursuant to

Rule 56(c) of the Federal Rules of Civil Procedure.  By Order dated July 28, 2009, the Honorable

Roslynn R. Mauskopf referred defendant's motion to me for a report and recommendation. Considering the evidence in the light most favorable to plaintiff, I find that there are genuine issues of material fact pertaining to plaintiff's employment status as either an independent contractor or employee. That being said, I find that no material facts are in dispute with which a reasonable jury could find that plaintiff was discriminated against on the basis of his religion in violation of Title VII and the New York Human Rights Law. I further find that, as a matter of law, plaintiff failed to establish that he was subject to a hostile work environment. Accordingly, I respectfully recommend that plaintiff's discrimination claims be dismissed and defendant's motion for leave to amend its answer be denied as moot. In light of my recommendation to grant summary judgment on the federal discrimination claims, I respectfully recommend that the Court decline to exercise jurisdiction over plaintiff's state-law claims.

## I.    BACKGROUND

The following facts are undisputed unless otherwise indicated. Roy Nazinitsky ("Nazinitsky" or "Plaintiff") was employed by Fairmont Insurance Brokers, Ltd ("Fairmont" or "Defendant") from 1993 to 2004. (Amended Complaint (hereinafter "Compl.") ¶ 1.) Fairmont operates an insurance brokerage business in Brooklyn, New York and primarily relies on salespersons, known as associate producers, to sell insurance to customers. (Def's. 56.1 Stmt. ¶ 1-2.) Prior to commencing work at Fairmont, associate producers must sign an Associate Producer Agreement ("Agreement").

A majority of Fairmont employees are Orthodox Jews, including its principals, Charles Katz ("Katz"), Chairman, and Moishe Mishkowitz ("Mishkowitz"), President. (Mishkowitz Decl. ¶ 35; Nazinitsky Aff. ¶¶ 13-15.); however, not all of Fairmont's employees are Jewish. (Id. ¶¶ 20, 31.) Nazinitsky, for example, was a non-practicing Jew throughout his employment at

Fairmont (Compl. ¶ 15.), and Anthony Defede, Fairmont's most successful producer, was a practicing Roman Catholic. (Nazinitsky Aff. ¶¶ 20, 31; Mishkowitz Decl. ¶ 38.)

In the summer of 1993, Nazinitsky and Fairmont entered into the Agreement. (Compl. ¶ 2.) The Agreement provided that Nazinitsky would act as an independent contractor and, as such, Fairmont would supply Nazinitsky with workspace, telephones, and copying equipment, but it would not control or supervise the hours or the manner of Nazinitsky's work. (Agreement ¶ 1.) Additionally, the Agreement affirmed that Nazinitsky would receive forty percent of the commissions paid to Fairmont for business he secured. (Id. at ¶ 16.)

Fairmont did not provide Nazinitsky with health insurance benefits. (Nazinitsky Dep. 9:10-10:8.) Nazinitsky claims that Fairmont provided health insurance benefits to Hasidic employees that held the same or similar position as him (Compl. ¶ 4), however, Fairmont maintains that its producers are not eligible for health insurance unless they pay their own premiums. (Def. 56.1 Stmt. ¶ 3.) One associate producer, Mordy Littman, corroborated that the premiums for his health insurance were withheld from his commissions. (Mordy Littman ("Littman") Dep. 106:11-17.) Fairmont likewise maintains that another associate producer, Anthony Defede, paid for his own premiums. (Mishkowitz Decl. ¶ 50)

The Agreement also included a Restrictive Covenant that restricted Nazinitsky from engaging in competitive activities for a period of three years after his termination from Fairmont. (Agreement ¶ 26.) Specifically, Nazinitsky was not permitted to solicit or accept renewal business from or otherwise deal with Fairmont customers, induce Fairmont customers to change coverage, or open his own insurance brokerage business. (Id.) The Agreement also granted Nazinitsky the right to receive "additional compensation" based on his years of service and the volume of commissions retained by Fairmont. (Id. at ¶ 25.)

Certain Orthodox Jews at Fairmont used a basement conference room every afternoon at 4:00 pm for a joint prayer session, known as Minyan. (Nazinitsky Dep. 49:1-18.) Not all employees attended Minyan; generally, between ten to twenty people were in attendance, including those who were not professionally affiliated with Fairmont. (Mishkowitz Decl. ¶¶ 44, 45.) Early in Nazinitsky's tenure at Fairmont, employees, including Mishkowitz, would occasionally invite Nazinitsky to attend Minyan (i.e., "come down" and "join us"), (Nazinitsky Dep. 51:18-19), and inquire "why don't you pray?" (id. at 68:5-6), or invite him to spend the Sabbath with them outside of the office. (Id. at 73:9-13.) Nazinitsky only attended Minyan fifteen to twenty times throughout his approximately eleven year affiliation with Fairmont. (Id. at 52:11-53:19.) Nazinitsky asserts that he was afraid to tell his colleagues he did not want to attend and, in the instances when he did attend, felt uncomfortable. (Id. at 54:16-20.) Although Defede, a Roman Catholic associate producer, did not attend the prayer sessions, Nazinitsky contends that Defede was insulated from discriminatory comments because his private office was located on a different floor and he hired his own support staff. (Nazinitsky Aff. ¶ 33.)

In addition to invitations to attend Minyan, Nazinitsky recalls discussions with Katz centered on Jewish people, the lower divorce rates among religious people, the importance of prayer, and why Hasidic people are "better." (Nazinitsky Dep. 60:2-7; 190:8-13.) Nazinitsky found these conversations to be intimidating and akin to lectures. (Nazinitsky Aff. ¶ 18.) Nazinitsky also recounts that staff members, on a few occasions, commented on the fact that he did not wear a yarmulke. (Nazinitsky Dep. 71:18-23; 72:3-14.)

Nazinitsky alleges that early in his tenure, Fairmont provided him with inadequate customer support. (Compl. ¶ 20.) For example, Nazinitsky cites the incompetence of Chaya Stern ("Stern"), a customer service employee assigned to handle Nazinitsky's new business

clients' applications.  (Def.'s 56.1 Stmt. ¶ 71.)  Stern was only one of two customer service employees at Fairmont and therefore was assigned to other Fairmont producers.  (Nazinitsky Dep. 30:4-21:13).  Despite initial claims of inferior services, Nazinitsky later concedes that all salespersons complained about the inadequacies of customer service personnel.  (Id. at 37:15-39:6, 139:15-24.)  Although Nazinitsky also alleges that Fairmont's practice of withholding clients' premiums negatively impacted his employment, he later concedes that other Fairmont producers experienced this problem as well.  (Id. at 130:10-24).

Although, initially, Nazinitsky worked in a public area among other associate producers (Nazinitsky Dep. 129:4-21), Fairmont later provided Nazinitsky with a private office in 1996 due in part to his high earnings.  (Nazinitsky Aff. ¶ 5 n.3; Mishkowitz Decl. ¶ 14.)  He was one of only two producers who had a private office at this time.  (Def.'s 56.1 Stmt. ¶ 15.)

In or about 2001, Nazinitsky began to work at the Fairmont offices less frequently. (Def.'s 56.1 Stmt. ¶ 16.)  Nazinitsky maintains that the decreased time in the office was due to the discrimination he experienced while at work, as well as the increasing difficulties he encountered at and traveling to Fairmont.  First, Nazinitsky's computer broke and despite repeated requests, Fairmont never fixed it.  (Nazinitsky Decl. 147:2-8.)  Instead, they removed the broken computer from his office.  (Nazinitsky Aff. ¶ 26.)  Faced with the need for a functioning computer, Nazinitsky bought his own desktop computer.  (Id.)  Thereafter, Nazinitsky spent more time working from home.  (Nazinitsky Dep. 151:14-22.)  Second, Nazinitsky notes that he moved from Brooklyn to Long Island, which made it more difficult and time consuming to work at Fairmont's Brooklyn offices.  (Nazinitsky Aff. ¶ 45.)  Third, Charles Kaplan ("Kaplan"), an employee affiliated Fairmont and a Hasidic Jew, began to use Nazinitsky's private office.  (Id. at ¶¶ 22-23.)  Nazinitsky maintains that Kaplan was permitted to

use his office based on the fact that Kaplan was friends with Katz and a Hasidic Jew. (Nazinitsky Dep. 154:15-22.) Mishkowitz claims that because Nazinitsky was in the office less frequently and not producing at his former level, Nazinitsky was no longer entitled to the exclusive use of a private office. (Def.'s 56.1 Stmt. ¶ 17.) Fairmont later removed Nazinitsky's personal desk from the shared office and placed it in an adjacent Fairmont building. (Mishkowitz Decl. ¶ 17.)

By 2002, Fairmont no longer provided Nazinitsky with a private office and required Nazinitsky to share the open desk space with the other producers. (Nazinitsky Aff. ¶ 5 n.3.) When Nazinitsky asked Mishkowitz where he should work, Nazinitsky recalls Mishkowitz responding, "work at another desk." (Nazinitsky Dep. 163:2-3.) By this time, Nazinitsky was the only salesperson who did not have his own computer or his own desk. (Nazinitsky Aff. ¶ 7.)

In addition to his discrimination claims, Nazinitsky alleges that Fairmont engaged in improper business practices that, had he known about prior to his employment, would have negated his decision to work at Fairmont. (Nazinitsky Aff. ¶ 37.) Nazinitsky contends that Fairmont: (1) illegally allowed its unlicensed customer service representatives to sell insurance; (2) altered its loss runs; (3) extensively used wholesalers to place insurance as opposed to insurance companies; (4) failed to timely remit premiums; (5) improperly charged finance fees to its insureds; and (6) blocked the market. (See id. ¶ 38-43.) Fairmont responds to these allegations by asserting, respectively: (1) its customer service representatives at times were of poor quality; (2) it never lost direct status with any carrier as a result of supposed falsification of loss run; (3) most insurance business is placed through wholesalers; (4) no practice existed at Fairmont that improperly held customers' premium carriers; (5) it did not charge additional fees,

but passed along insurance carrier billings for premiums; and (6) it did not block the market. (See Def.'s 56.1 Stmt. ¶ 59-70.)

By 2002, Nazinitsky's production began to decline and as a result he earned fewer commissions. (Mishkowitz Decl. ¶ 55.)  During 2003, Nazinitsky only visited the office one or two days per week.  (Nazinitsky Aff. ¶ 46.)  Nazinitsky claims his decreased attendance coincided with his denial of a specifically assigned workplace and the subsequent humiliation of not having his own office, desk, and computer.  (Id. at ¶ 47.)

In May 2004, Mishkowitz and Katz met with Nazinitsky to discuss his declining production and offered options including book-sharing with another associate producer. (Def.'s 56.1 Stmt. 23.)  Soon after, Nazinitsky sent a formal letter of resignation to Mishkowitz. (Nazinitsky Aff. ¶ 53.)

A few months after his resignation, Nazinitsky joined Grober-Imbey Agency ("Grober"). (Nazinitsky Aff. ¶ 54.)  Fairmont alleged that Nazinitsky was soliciting and dealing with Fairmont customers in breach of the Agreement's Restrictive Covenant. (Def.'s 56.1 Stmt. ¶ 25.) Pursuant to these allegations, Fairmont commenced an action in the Supreme Court Kings County, seeking injunctive relief, which the Supreme Court granted.  (Id. at ¶ 27.)  Nazinitsky denied that he breached the Restrictive Covenant and filed a counterclaim for fraud and breach of contract, alleging that Fairmont failed to pay commissions owed to him before and after his resignation. (Nazinitsky Aff. ¶¶ 55, 58.)   In 2005, the parties agreed to dismiss the action without prejudice.  (Nazinitsky Aff. ¶¶ 59, 60.)

Subsequent to the dismissal, Fairmont paid Nazinitsky $25,000 in lost commissions and asserted that Nazinitsky forfeited his rights to any additional compensation due to his breach of the restrictive covenant.  (Nazinitsky's Aff. ¶¶ 30, 61.)   Nazinitsky insists that this payment is

insufficient as Fairmont owes him commissions totaling $200,000.  (Id. at ¶ 70.)   Fairmont

maintains that $25,000 is more than adequate, asserting that Nazinitsky was only entitled to

$24,010 and that, in return, Nazinitsky owes Fairmont $16,800 for lost commissions due to his

breach of the restrictive covenant.  (Def.'s 56.1 Stmt. ¶ 37.)

On May 11, 2005, Nazinitsky filed a charge of discrimination with the New York State

Division of Human Rights, and was issued a Right to Sue Letter on July 17, 2006.  (Nazinitsky

Aff. ¶ 62.)   On June 19, 2006, Nazinitsky filed suit against Fairmont in the state Supreme Court

for breach of contract and negligent misrepresentation.  (See Dkt No. 1.)  Upon receiving the

Right to Sue, Nazinitsky commenced this action, alleging that he was the victim of

discrimination on the basis of his lack of religiosity and that defendant treated him disparately.

(See id.)  Fairmont contends that summary judgment is appropriate because there are no issues of

material fact in dispute.

## II.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  The

burden is upon the moving party to demonstrate that "no genuine issue of material fact exists,"

Marvel Characters, Inc.  v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted), but "the

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact," <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" <u>Konikoff v. Prudential Ins. Co. of Am.</u>, 234 F.3d 92, 97 (2d Cir. 2000) (<u>quoting</u> <u>Anderson</u>, 477 U.S. at 248).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" <u>Marvel Characters</u>, 310 F.3d at 286 (<u>citing</u> <u>Matsushita</u>, 475 U.S. at 587; <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000)).  To defeat a properly supported motion for summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" <u>Matsushita</u>, 475 U.S. at 587 (<u>quoting</u> Fed. R. Civ. P. 56(e)) (emphasis in original).  The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Id.</u> at 586 (citations omitted).  Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.  <u>See</u> <u>Shannon v. N.Y. City Transit Auth.</u>, 332 F.3d 95, 99 (2d Cir. 2003) (citation omitted).  The non-moving party must produce "significant probative evidence" demonstrating that a factual dispute does in fact exist.  <u>Anderson</u>, 477 U.S. at 249 (citation omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249-50 (citations omitted).

However, "[t]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth

at trial."  Id. at 248-49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)).  In deciding a motion for summary judgment, the court's function is not to weigh the evidence or resolve issues of fact, but only to determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250; see also Lucente v. IBM, 310 F.3d 243, 254 (2d Cir. 2002).

The Second Circuit has instructed that district courts must be cautious when considering summary judgment in favor of an employer in an employment discrimination case, because direct evidence of discriminatory intent is rare and often must be inferred from circumstantial evidence in affidavits and depositions.  See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).  Nevertheless, the court has also explained that "summary judgment remains available for the dismissal of discrimination claims lacking genuine issues of material fact."  Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citations omitted).

## B.  Leave to Amend

Fairmont asserts that the Court should grant it leave to amend its answer to include a statute of limitations defense to the Title VII claim.  Federal Rule of Civil Procedure 15(a) instructs that a leave to amend an answer "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  However, a motion to amend should be denied "if there is an 'apparent or declared reason—such as undue delay, bad faith or dilatory motive…, [or] futility of amendment.'"  Dluhos v. Floating and Abandoned Vessel, 162 F.3d 63, 69 (2d Cir. 1998) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962).  Leave to amend should not be denied due to futility "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 604 (2d Cir. 2005) quoting Conley v. Gibson, 355 U.S. 41, 46 (1957).

The Court's decision to deny or grant Fairmont's leave to amend is futile based on my recommendation to grant summary judgment on the discrimination claim discussed below. If the Court grants summary judgment, there is no substantive claim on which Fairmont can assert an affirmative defense, and thus no claim on which to grant a leave to amend.

Further, even if, *arguendo*, summary judgment is denied, Fairmont's leave to amend should not be granted because "a party wishing to raise the defense is obligated to plead to the statutes of limitations at the earliest possible moment[.]" Strauss v. Douglas Aircraft Co., 404 F.2d 1152, 1155 (2d Cir. 1968). In Babcock v. Lane, MD, No. 86 Civ. 1100, 1990 WL 3194, at *4 (S.D.N.Y. Jan. 10, 1990), the district court denied defendant's motion for leave to amend to add a statute of limitations defense. Id. at 4. Although defendant asserted that "the motion was made immediately upon the close of discovery which had established the merits of the defense," the court declared that "[it] d[id] not accept…that defendant was unable to contemplate before the completion of discovery in this action that the statute of limitations defense could have been interposed." Id. Thus, based on the completion of discovery and the court's determination that the addition of a statute of limitations defense would unduly prejudice the plaintiff, the district court denied defendant's motion to amend its answer. Id.

Similarly, Fairmont waited two years after it filed its answer and fifteen months after Nazinitsky's deposition to assert a statute of limitations defense (Pl. Memo. of Law in Opp'n of Summ. J. 1). Fairmont justifies the delay by contending that "it was not apparent until after Nazinitsky testified at his disposition that he could not assert any timely claim." (Def. Memo. of Law in Support of Summ. J 24.) Such an excuse is not sufficient to explain the two year delay,

however, as Fairmont was advised of the relevant dates pertaining to the hostile work environment claim upon the EEOC's issuance of Nazinitsky's Right to Sue Letter in 2006. Thus, I find it inconceivable that Fairmont was unable to contemplate before the completion of discovery that the statute of limitations defense could have been interposed. See Babock, 1990 WL 3194, at *4. Therefore, I recommend that defendant's motion to leave to amend be denied.

## C. Plaintiff's Claim Under Title VII

### 1. Failure to State a Claim

Defendant moves for summary judgment on Nazinitsky's Title VII and NYHRL claims.[1] Specifically, defendant contends that Nazinitsky is an independent contractor and, under Title VII, only an employee may bring suit. 42 U.S.C. § 2000e, et seq. (2006). When determining whether a hired person constitutes an employee, the Supreme Court utilizes a non-exhaustive thirteen factor test. Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989). The thirteen factors include:

> [1] [T]he hiring party's right to control the manner and means by which the product is accomplished[;] . . . . [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; [13] and the tax treatment of the hired party.

Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 227 (2d Cir. 2008) (quoting id.). When balancing these factors, "the 'greatest emphasis, should be placed on the first factor … the 'manner and means' by which the worker completes his or her task." Eisenberg v. Advance

---

[1] As is done routinely in this Circuit, the Court will treat Nazinitsky's claims under Title VII and the NYSHRL "as analytically identical, applying the same standard of proof to both claims." See Salamon, 514 F.3d at 226 n. 9 (considering sex discrimination claims); Schiano v. Quality Payroll Sys., 445 F.3d 597, 609 (2d Cir. 2006) (applying same standards to hostile work environment claims under federal and New York state law). Thus, in determining whether the defendant is entitled to summary judgment under the above provisions of New York State Human Rights Law, I will consider whether defendant is entitled to summary judgment under Title VII.

Relocation & Storage, Inc., 237 F.3d 111, 114 (2d Cir. 2000).  This consideration is particularly

true in anti-discrimination cases.  See Salamon, 514 F.3d at 227.

Here, Fairmont relies on certain facts to support its argument that Nazinitsky was an

independent contractor:  (1) the Agreement categorized associate producers as independent

contractors  (Def.'s 56.1 Stmt. ¶ 2); (2) Fairmont did not control the hours Nazinitsky worked or

the manner in which he sought to sell insurance (id. ¶ 10); (3) he was paid on a 1099 basis[2] (id. ¶

11); and (4) he was not eligible to receive health insurance benefits from Fairmont.  (Id. ¶ 12.)

In contrast, Nazinitsky offers evidence in support of his status as an employee.  First,

Mishkowitz, the President of Fairmont, stayed in direct contract with Nazinitsky's clients and

would meet with them in Nazinitsky's absence.  (Mishkowitz Dep. 101:19-102:12.)  Second,

while Nazinitsky had general discretion in choosing prospective clients, Fairmont directed

Nazinitsky to seek particular kinds of business from specific areas.  (Nazinitsky Aff. ¶  3, 9;

Mishkowitz Decl. ¶ 21.)  Third, Fairmont exclusively controlled the instrumentalities and tools

that Nazinitsky utilized to complete his work, such as a support staff, a desk, telephones, copying

equipment, and a computer.  (Id. at ¶ 5.)  Fourth, Nazinitsky had a lengthy relationship with

Fairmont which spanned over ten years. (Def.'s 56.1 Stmt. ¶¶ 4, 9, 24.)  Fifth, Fairmont assigned

Nazinitsky additional projects by specifying the particular types of insurance that Nazinitsky

should sell.  (Nazinitsky Aff. ¶ 3.)

The issue of whether a hired worker is an independent contractor or an employee is

"typically a question for the factfinder, unless the evidence in the record relevant to this question

is undisputed, in which case a court may resolve the issue as a matter of law." See Murphy v.

---

[2] Independent contractors generally utilize 1099 tax forms, whereas employees utilize W-2 forms.  Perfect Dental,
PLLC v. Allstate Ins. Co., 538 F.Supp.2d 543, 546 n.3 (E.D.N.Y. 2007).  However, while the manner in which the
employer-worker relationship is treated for income tax purposes is certainly a significant consideration in
determining whether a hired person is an independent contractor or employee, "it is generally not singularly
dispositive."  Gagen v. Kipany Prods., Ltd., 812 N.Y.S.2d 689 (3d Dep't 2006).

<u>Guilford Mills, Inc.</u>, No. 02 Civ. 10105, 2005 WL 957333, at *5 (S.D.N.Y. Apr. 22, 2005). Because there is a genuine issue of material fact regarding whether Fairmont controlled the manner and means of its associate producers, as a matter of law, summary judgment is precluded. Thus, I respectfully recommend that summary judgment be denied as to the claim that Nazinitsky's Title VII cause of action is barred, but, as discussed *infra*, I will recommend that the claim be dismissed on the merits.

## 2. Liability Under Title VII

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000-e2(a)(1). Title VII suits can be based on either "a 'disparate treatment' claim, where the plaintiff alleges that a specific discriminatory employment action was taken on the basis of impermissible considerations, or a 'hostile work environment' claim, where the plaintiff alleges that the work environment was severely abusive as to his [religion]." <u>Russo Lubrano v. Brooklyn Federal Sav. Bank</u>, No. 06 Civ. 672, 2007 WL 121431, at *4 (E.D.N.Y Jan. 12, 2007) (Sifton, J.) (<u>citing Galvez v. New York Mortg. Co., LLC</u>, No. 05 Civ. 2365, 2005 WL 2124112, at *5 (S.D.N.Y.2005). Discriminatory treatment may occur when an employee is required or coerced to abandon, alter, or adopt a religious practice as a condition of employment or is subject to unwelcome statements or conduct based on religion that is so severe or pervasive that the employee is subject to a hostile environment. <u>See</u> <u>e.g.</u>, <u>Venters v. City of Delphi</u>, 123 F.3d 956, 975 (7th Cir. 1997).

### a. Disparate Treatment

The Amended Complaint is ambiguous as to whether Nazinitsky asserts a disparate treatment or a hostile work environment claim. In his pleadings, Nazinitsky styles his Title VII claim as a disparate treatment claim and addresses each element of the claim, including adverse employment, satisfactory performance, and discrimination based on lack of religious belief. (See Compl. ¶ 49-51.) Despite implications of a disparate treatment claim, Nazinitsky later denies asserting such a claim, clarifying that he "is not herein asserting a disparate treatment claim, [however] certain arguments that Fairmont raises in response to Plaintiff's disparate treatment claim may apply to his hostile work environment claim." (Pl. Memo. of Law in Opp'n of Summ. J. 20.)

Additionally, even if, *arguendo*, Nazinitsky chose to bring forth a disparate treatment claim, he fails to meet the requisite burden of proof to survive summary judgment. Disparate treatment claims are analyzed using the familiar burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under this framework, plaintiff must first prove a prima facie case of discrimination. Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); Quarantino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995). Should the plaintiff establish a prima facie case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its employment action. McDonnell Douglas, 411 U.S. at 802; Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997). If the employer carries this burden, the plaintiff must then demonstrate by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). To do so, a plaintiff must convince the trier of fact that the defendant's proffered reasons

are false.  <u>McCarthy v. N.Y. Technical Coll. of City Univ. of N.Y.</u>, 202 F.3d 161, 166 (2d Cir. 2000).  "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993).  If the plaintiff fails to show that there is evidence that would permit a rational fact-finder to infer that the employer's rationale is pretext, summary judgment is appropriate.  <u>Smith v. American Express Co.</u>, 852 F.2d 151, 154-55 (2d Cir. 1988).   Based on the fact that Fairmont provided non-discriminatory and legitimate reasons for the adverse employment actions and Nazinitsky responded to such reasons by denying his assertion of a disparate treatment claim, Nazinitsky has not offered evidence to meet the requisite standard of proof.

## b.  Hostile Work Environment

As Fairmont properly notes in its brief in support of summary judgment, it is unclear as to whether Nazinitsky asserts a hostile work environment claim in the Amended Complaint. (Def.'s 56.1 Stmt. ¶17.)  In spite of the pleadings ambiguity, the Court "construes the colloquy between the parties' briefs," specifically defendant's motion for summary judgment and plaintiff's memorandum of law in opposition, as sufficient to allege a hostile work environment claim.  <u>See</u> <u>Coudert v. Janney Montogomery Scott</u>, No. 03 Civ. 324, 2005 WL 1563325, at *2 (D. Conn. Jul. 1, 2005); <u>see</u> <u>also</u> <u>Fed.R.Civ.P. 15(b)</u> ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings.").

Therefore, to the extent that Nazinitsky asserts a hostile work environment claim under Title VII, Nazinitsky must establish that the workplace was permeated with "discriminatory intimidation, ridicule, and insult … sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." Harris v. Forklift Sys, Inc., 510 U.S. 17, 21 (1993).  The claim has "objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Harris, 510 U.S. at 21).  Further, the Second Circuit stresses that "[i]t is … important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." Alfano, 294 F.3d at 377; White v. N.Y. City Dep't of Educ., No. 05 Civ. 2064, 2008 WL 4507614, at *5 (E.D.N.Y Sept. 30, 2008) (holding that plaintiff must demonstrate that "the conduct occurred because of, not incidental to, the protected characteristic) (citations omitted); Bookman v. Merrill Lynch, No. 02 Civ. 1108, 2009 WL 1360673, at *17 (S.D.N.Y. May 14, 2009) (noting that the plaintiff must also establish a link between the offensive conduct and his membership in a protected class).  When determining whether conduct constitutes a hostile work environment, courts assess the totality of the circumstances,  see Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001), including the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with plaintiff's work performance.  See Harris, 510 U.S. at 23.

Here, Nazinitsky cites five incidents as evidence of discriminatory harassment: (1) assignment of inferior support services; (2) preclusion from obtaining group health insurance on the same terms as Orthodox producers; (3) deprivation of earned compensation; (4) denial of a private computer; and (5) removal from a private office and denial of a dedicated workspace. (Compl. ¶ 20-25.)  Additionally, Nazinitsky avers that his superior, Katz, sought to proselytize

Nazinitsky through numerous conversations that were akin to lectures. (Pl.'s Memo. in Opp'n of Summ. J. 18.)

Nazinitsky, however, fails to provide the requisite linkage between his treatment and his lack of religiosity. See Alfano, 294 F.3d at 377. First, although Nazinitsky initially alleged that only Hasidic employees were provided with customer support services (Compl. ¶ 20), he later conceded that all of the associate producers complained about inferior support services. (Nazinitsky Dep. 139:15-24.) Second, Mordy Littman and Anthony Defede, also associate producers, did not receive group health insurance from Fairmont; they paid for their own premiums. (Littman Dep. 106:7-16; Mishkowitz Decl. ¶ 50). Third, the denial of Nazinitsky's compensation relates to Fairmont's breach of contract and restrictive covenant claim and not Nazinitsky's lack of religiosity; this state-law issue will later be decided by a trier of fact. (Def.'s 56.1 Stmt. ¶ 30.) Fourth, Nazinitsky's lack of access to a computer and private office does not support an inference of religious discrimination as evidenced by the fact that another associate producer, Defede, was a Roman Catholic and had access to his own office and computer. (Nazinitsky Dep. 149:13-21.)

Lastly, in determining whether a linkage exists, it is significant that Nazinitsky's lack of Jewish observance was already apparent to Fairmont in the first few years of Nazinitsky's employment, and yet, Nazinitsky still received a significant employment privilege—a private office. Despite his lack of daily attendance at Minyan (Nazinitsky Dep. at 52:19-25; 53:19-24; 72:3-15), and his failure to wear a yarmulke (Nazinitsky Aff. ¶ 16), Fairmont provided Nazinitsky with a private office from 1996 to 2002. (Nazinitsky Aff. ¶ 5 n.3.) Indeed, at one point, Nazinitsky, a non-Orthodox Jew, and Defede, a Roman Catholic, were the only salespersons at Fairmont to have private offices. (Nazinitsky Dep. 149:13-21.)

Nazinitsky also fails to establish that his superiors' religious commentary was "objectively hostile." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006). Although Nazinitsky maintains that his religiously oriented conversations with Katz were "intimidating" and "uncomfortable," (Nazinitsky Aff. ¶ 18) the conversations were not personally insulting, nor were they obviously intended to intimidate, ridicule, or demean plaintiff on account of his lack of religiosity. See Kunzler v. Canon , USA, Inc., 257 F.Supp.2d 574, 583 (E.D.N.Y. 2003) ("Plaintiff's feelings of discomfort … can support neither a claim of retaliation nor a direct claim that he was somehow subject to a hostile work environment."); cf. Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (holding that defendant's frequent comments demonstrating overt animosity and anti-Semitism were pervasive and personally insulting). Even if Nazinitsky can establish that his superiors and other Fairmont employees made comments about his lack of religiosity and treated him unfairly, such conduct is insufficient to create a hostile work environment. Rumala v. N.Y. City Transit Auth., No. 02 Civ. 3828, 2005 WL 2076529, at *12 (Aug. 26, 2005) (Townes, J.). It is well settled in the Second Circuit that "incidents showing that a supervisor disliked an employee and was rude or unfair to him do not, without more, prove a claim of hostile work environment." Id (citing Thomas v. N.Y. City Health and Hosps. Corp., 2004 WL 1962074, at *15 (S.D.N.Y. Sept. 2, 2004).

Considering this record in the light most favorable to plaintiff, the incidents outlined therein still do not rise to the level of conduct that is "'severe or pervasive enough to create an objectively hostile or abusive work environment.'" Alfano, 294 F.3d at 374 (quoting Harris, 510 U.S. at 21). Additionally, Nazinitsky has not presented sufficient evidence to establish the requisite causal connection between the alleged adverse employment actions and his lack of religiosity. Accordingly, I recommend that summary judgment on this claim be granted.

**D. Constructive Discharge**

To the extent that Nazinitsky claims he was constructively discharged, he must establish that Fairmont, " rather than discharging him directly, intentionally create[d] a work atmosphere so intolerable that he [was] forced to quit involuntarily."  <u>Terry v. Ashcroft</u>, 336 F.3d 128, 151-52 (2d Cir. 2003) (citing cases).  In determining whether this standard has been met, courts generally focus on the employer's intentional conduct and the intolerable level of the work conditions.  <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 229 (2d Cir. 2004).  To succeed on a hostile-environment constructive discharge claim, plaintiff must prove that the working conditions were so intolerable that a reasonable person would have felt compelled to resign"  <u>See</u> <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 147 (2004)

Nazinitsky's bases his constructive discharge claim on his hostile work environment claim (<u>See</u> <u>Compl.</u> ¶ 26).  Because Nazinitsky has not brought forth sufficient evidence to support a hostile work environment claim, any allegation of a constructive discharge must also fail. <u>See</u> <u>Sinopoli v. Regula,</u> No. 97 Civ. 7229, 1997 WL 624987, at *2 (2d Cir. 1997) (unpublished table decision) (rejecting a claim of constructive discharge based on a hostile work environment where there was insufficient evidence of "severe and pervasive" conduct); <u>Colter v. Yale Univ.</u>, No. 97 Civ. 2024, 2000 WL 559023, at *4 (D. Conn. Mar. 24, 2000) (finding conduct that is not "severe and pervasive" enough to establish a hostile work environment could not serve as the basis for a constructive discharge claim).  I therefore recommend that summary judgment be granted on the constructive discharge claim.

**E. Plaintiff's State Law Claims**

Upon granting summary judgment on all the federal claims, I also recommend that the Court decline to exercise supplemental jurisdiction over plaintiff's state-law claims, specifically his

breach of contract and negligent misrepresentation claims.  See Section 1367(c)(3) (noting that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it has original jurisdiction …"); Valencia ex rel. Franco v. Lee, 316 F.3d 299, 307-08 (2d Cir. 2003) (holding that the district court abused its discretion by exercising jurisdiction over a state-law claim following summary judgment dismissing the plaintiffs' federal claims).

### III.    CONCLUSION

For the foregoing reasons, I recommend that the defendant's motion for summary judgment be granted as to plaintiff's hostile work environment and constructive discharge claims.  I further recommend that the Court decline to exercise supplemental jurisdiction over plaintiff's state-law claims.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, with ten (10) days of receipt of this report.   Failure to file objections within the specified time waives the right to appeal any judgment entered by the District Court's in reliance on this Report and Recommendation.  See 28 U.S.C. § 636(b)(1) (2005); Fed. R. Civ. P. 72, 6(a), 6(e).


SO ORDERED.


Dated:    December  4, 2009
            Brooklyn, New York


_____/s/_____
Joan M. Azrack
United States Magistrate Judge